UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 90-cr-10313-PBS-1 |
| | ) | |
| v. | ) | ***LEAVE TO FILE REPLY*** |
| | ) | ***GRANTED 5/22/25 (D.E. 4352)*** |
| DARRYL WHITING | ) | |

### REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)

Darryl Whiting, by and through undersigned counsel and with leave from this Court, submits this reply to the government's opposition (D.E. 4348) to his motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A) (D.E. 4335). For the reasons outlined in Mr. Whiting's original motion, and as detailed below, Mr. Whiting is eligible for resentencing under 18 U.S.C. § 3582(c)(1)(A), U.S.S.G. § 1B1.13(b)(5) and (b)(6), and *United States v. Ruvalcaba*, 26 F.4th 14, 19, 23-24 (1st Cir. 2022).[1] We continue to submit that this Court should reduce his life sentence to a within-guideline sentence of time served. Mr. Whiting renews his request for a hearing.

I.      **The Sentencing Commission Acted Within Its Delegated Authority to Issue U.S.S.G. § 1B1.13(b)(6) and First Circuit Precedent Binds this Court to the Commission's Policy Statement When Reviewing § 3582(c)(1)(A) Motions.**

The government contends that the United States Sentencing Commission ("Commission") exceeded its statutory authority in promulgating U.S.S.G. § 1B1.13(b)(6). This contention is incorrect and is inconsistent with First Circuit precedent. Congress directed the Commission, not the courts, to issue binding guidance as to "what should be considered extraordinary and

---

[1] Without repeating the arguments in his original motion, it is important to note that the government's response failed to engage with – and thus has not contested – the recent sentencing and prosecution trends involving life sentences, the sentencing judge's characterization of Mr. Whiting's then-mandatory life sentence as "extremely harsh," the significant mitigation of Mr. Whiting's life explored by Ms. Cohen, and Mr. Whiting's separate claim for relief under U.S.S.G. § 1B1.13(b)(5). Moreover, contrary to § 1B1.13(d) and the Supreme Court's directive to consider post-sentencing conduct, the government also failed to discuss Mr. Whiting's substantial rehabilitation and the Bureau of Prisons' assessment that he presents a "minimum" risk of recidivism. *See United States v. Pepper*, 562 U.S. 476 (2011) and *Concepcion v. United States*, 597 U.S. 481 (2022).

compelling reasons for sentence reduction" within the meaning of § 3582(c)(1)(A). 28 U.S.C. § 994(t). The sole limitation on the Commission's authority is that rehabilitation alone cannot justify a reduction in sentence. *Id.* Nothing in the statute's text prohibits the Commission from considering nonretroactive changes in the law as extraordinary and compelling reasons for a sentence reduction, and the plain language of § 3582(c)(1)(A) requires sentence reductions be "consistent with applicable policy statements issued by the Sentencing Commission." Now that the Commission has issued a new policy statement, (b)(6) controls and is binding on this court.

Absent an amended policy statement for prisoner-filed compassionate release motions after the passage of the First Step Act, many circuits split on whether courts could consider nonretroactive changes in sentencing law to determine "extraordinary and compelling" circumstances warranting a sentence reduction under § 3582(c)(1)(A).[2] The First Circuit has explicitly and consistently held that nonretroactive changes in law *can* constitute extraordinary and compelling reasons to warrant a sentence reduction. *Ruvalcaba*, 26 F.4th at 25-26. *See also United States v. Cruz-Rivera*, 2025 WL 1367721 (1st Cir. 2025) (endorsing sentencing disparities and non-retroactive changes to stacked sentences imposed under 18 U.S.C. § 924(c) as extraordinary and compelling reasons).

Urging deference to the Commission's congressionally delegated authority to set the bounds for sentence-reduction motions under § 3582(c)(1)(A), the government consistently and successfully urged the Supreme Court to deny certiorari review of whether courts may consider

---

[2] The First, Second, Fourth, Ninth, and Tenth Circuits held that sentencing courts may consider nonretroactive changes in the law to determine whether extraordinary and compelling reasons warrant a sentence reduction. *See Ruvalcaba*, supra; *United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020); *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020); *United States v. Chen*, 48 F.4th 1092 (2022); *United States v. Maumau*, 993 F.3d 821 (10th Cir. 2021). The Third, Fifth, Seventh, Eighth, and D.C. Circuits have held that such changes in law could never be extraordinary and compelling reasons. *See United States v. Andrews*, 12 F.4 th255 (3d Cir. 2021); *United States v. McMaryion*, 2023 WL 4118015 (5th Cir. 2023); *United States v. Thacker*, 4 F.4th 569 (7th Cir. 2021); *United States v. Crandall*, 25 F.4th 582 (8th Cir. 2022); *United States v. Jenkins*, 50 F.4th 1185 (D.C. Cir. 2022).

nonretroactive changes in sentencing law to determine "extraordinary and compelling" circumstances warranting a sentence reduction under § 3582(c)(1)(A) for prisoner-filed motions after the passage of the First Step Act.[3] And, as hoped for, in November 2023, the Commission issued a new policy statement which explicitly resolved this circuit split and, as relevant here, provided narrow and well-defined circumstances under which courts can consider nonretroactive changes in the law to support a sentence reduction. *See* U.S.S.G. § 1B1.13(b)(6); U.S.S.G. App. C, Amend. 814, Reason for Amendment (Nov. 1, 2023).

The policy statement was submitted to Congress in April 2023, and after Congress neither disapproved nor modified the amendment to the sentencing guidelines, it went into effect on November 1, 2023.[4] As the Supreme Court recognizes, "Congress is not shy about placing [sentencing modification] limits where it deems them appropriate." *Concepcion*, 597 U.S. at 494. Evidenced by the amendment's passage without comment or further change, Congress chose not to impose a similar prohibition with respect to (b)(6)'s narrow criteria for relief involving nonretroactive changes in the law.

Considering the government's earlier requests to defer to the Commission's authority to promulgate binding categories for extraordinary and compelling circumstances, it should be surprising that the government now argues that (b)(6) is invalid. Especially when the First Circuit's decision in *Ruvalcaba* makes clear that the Commission's authority regarding § 3582(c)(1)(A) is binding. *Ruvalcaba*, 26 F.4th at 19, 23-24 ("'[A]pplicable policy statements issued by the Sentencing Commission are binding on courts reviewing compassionate-release motions[,]'" and

---

[3] *See e.g.,* Br. for the U.S. in Opp'n at 17, *Jarvis v. United States*, No. 21-568, 2021 WL 5864543 (U.S. Dec. 8, 2021) (arguing that that the Commission had both the power and statutory duty to promulgate a policy statement for prisoner-filed compassionate release motions and to resolve the circuit split on this issue); Sentencing Guidelines for United States Courts, 88 Fed. Reg. 282254, 282258 (May 3, 2023) (noting "on several occasions the Department of Justice successfully opposed Supreme Court review of the issue on the ground that it should be addressed first by the Commission").

[4] *See* https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023.

district courts "will be required to ensure that their determinations of extraordinary and compelling reasons are consistent with [the Commission's] guidance."). Moreover, perhaps anticipating the government's claim of an invalid exercise of authority, the First Circuit addressed the substantive argument here and expressly found that consideration of non-retroactive changes in sentencing law as factors for sentence reduction motions under § 3582(c)(1)(A) does not contravene or usurp Congressional judgment or authority, and that courts are "*constrained only by the statutory criteria and any applicable policy statement.*" *Ruvalcaba*, 26 F.4th at 27-28 (emphasis added).

The First Circuit's reasoning and deference to the Commission in its issuance of binding policy statements is consistent with decisions in other circuits that have held (b)(6) to be a valid exercise of the Commission's statutory authority. *See e.g., United States v. Davis*, 99 F.4th 647, 658 (4th Cir. 2024) ("the latest policy statement serve[s] to conform and amplify this Court's earlier ruling" that "[n]onretroactive changes in law remain relevant when a court has to decide when and how to modify a sentence."); *United States v. Chavez*, No. 02-cr-1301, 2024 WL 4850808, at *3 (S.D.N.Y. Nov. 21, 2024) (holding that the Commission "had ample congressional authority to promulgate subsection (b)(6)"); *United States v. Spradley*, 98-cr-00038, 2024 WL 1702873 at *8 (S.D. Ind. Apr. 18, 2024) (finding (b)(6) valid, and holding that the Commission did not usurp congressional authority regarding retroactivity); *United States v. Capps*, No. 1:11-CR-00108-AGF, 2024 WL 880554 (E.D. Mo. Jan. 31, 2024) (same, finding § 1B1.13 binding on courts and rejecting post-FSA, pre-new § 1B1.13 Eighth Circuit precedent holding that nonretroactive changes in the law could not serve as the basis for a sentence reduction); *United States v. Pierce*, No. 11-CR-576 (PKC), 2024 WL 2219739, at *9 (S.D.N.Y. May 15, 2024) (finding "no basis to conclude that the Sentencing Commission overstepped its bounds in issuing subsection (b)(6)"); *United States v. Horton*, No. 11-03021-01-CR-S-MDH, 2025 WL 644278 (W.D. Mo. Feb. 27,

4

2025); *United States v. Thomas*, No. CR-12-00523-002-PHX-DGC, 2025 WL 918255 (D. Ariz. Mar. 26, 2025); *United States v. Allen*, 717 F.Supp.3d 1308 (N.D. Ga. 2024).

Although the Supreme Court is usually the entity responsible for resolving circuit conflicts, the Court has recognized that the Commission can "eliminate circuit conflict[s] over the meaning" of matters that Congress delegated to the Commission. *Braxton v. United States*, 500 U.S. 344, 348–49 (1991). Here, the Commission expressly intended for (b)(6) to resolve the circuit split involving non-retroactive changes in the law,[5] and the Commission's standards for sentence-reduction motions bind the courts. *Concepcion*, 597 U.S. at 495 ("Congress expressly cabined district courts' discretion by requiring courts to abide by the Sentencing Commission's policy statements."); *Dillon v. United States*, 560 U.S. 817, 830 (2010) (courts are "require[d]" to "follow the Commission's instructions … to determine the prisoner's eligibility for a sentence modification"); *Mistretta v. United States*, 488 U.S. 361, 391-93 (1989) (the Commission has "rulemaking power" sufficient to "bind judges and courts"). The argument of this Department of Justice to the contrary is thus unavailing in the face of the Commission's clearly delegated and recognized authority and First Circuit precedent: (b)(6) controls this Court's consideration of Mr. Whiting's compassionate release motion.

## II.    Mr. Whiting's Life Sentence is Grossly Disparate to the Sentence He Would Likely Receive Now.

Mr. Whiting is now 70 years old and has actually served 414 months, or 34.5 years. Had he been eligible to receive statutory good time, even accounting for his de minimis loss of credits,

---

[5] Amendments to the Sentencing Guidelines, Official Commentary, at 11-12 ("The amendment agrees with the circuits that authorize a district court to consider nonretroactive changes in the law as extraordinary and compelling circumstances warranting a sentence reduction but adopts a tailored approach that narrowly limits that principle[]" e.g., in requiring an unusually long sentence, at least 10 years served, gross disparity, and consideration of individual circumstances.) https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf

he has served the equivalent of a 40-year imposed sentence. Considering the now advisory nature of the guidelines, recent sentencing trends including the rarity of life sentences, the substantially reduced number of CCE prosecutions, and life sentence reductions in far more egregious cases, Mr. Whiting's life sentence is grossly disparate to what he would likely receive today. Instead of engaging with any of the comparable and more extreme cases warranting sentence reductions, the government summarily dismisses them – and in so doing, flatly ignores the last 40 years of sentencing trends and the unique circumstances of Mr. Whiting's case, life, and rehabilitation that demonstrate the gross disparity of his life sentence. As outlined below, and on balance with the § 3553(a) sentencing factors, a sentence of time served is sufficient but no more than necessary.

Almost as an aside, the government claims, without any authority and in a footnote, that *Booker* is not a "change in the law" to qualify for relief under (b)(6). The First Circuit has plainly described *Booker* as a substantial change in sentencing law. *See e.g., United States v. Vasquez-Rivera*, 407 F.3d 476 (1st Cir. 2005) (remanding for resentencing under *Booker* and referring to it as a "substantial change in the applicable law"); *United States v. Roman-Diaz*, 853 F.3d 591 (1st Cir. 2017) (noting that in *Booker*, "the Supreme Court effected a *sea change in the law of federal sentencing*, declaring the sentencing guidelines advisory and directing appellate courts to review sentences for reasonableness.") (emphasis added).

Several other courts have found that (b)(6) applies to unusually long sentences which, specifically due to the change in law brought forth by *Booker*, are grossly disparate to the sentences defendants would receive if sentenced today. *See e.g.,* cases cited at D.E. 4335, 17-18. In *United States v. Reedy*, for example, the district court reduced a pre-*Booker* 1,335-year sentence to 22 years, time served, explaining that "[w]hen taken together, a non-binding Guideline (which may not have produced a life sentence at the time) **and** a Congressionally enacted avenue for relief from such a sentence provide a sufficiently dramatic change in the relevant sentencing law[.]" 678

6

F.Supp.3d 859, 866 (N.D. Tex. 2024) (emphasis in original). The court reasoned that "the inability of a defendant to have mitigating factors considered in his individual case because of mandatory Guidelines and statutory maximums – which can undermine the statutory goals of sentencing – is one of the problems that *Booker* set out to solve, and the one that § 1B1.13(b)(6) can now remedy in part." *Id.* This inability to consider mitigating factors was explicitly referenced by Judge Skinner at Mr. Whiting's sentencing in 1991, as he lamented that he was "locked into" the mandatory life guideline and that Mr. Whiting's sentence was "extremely harsh" and "very severe." D.E. 4335-2 at 59, 73, 75.

Although the government concedes that Mr. Whiting's mandatory life sentence is unusually long, it argues that his sentence is not grossly disparate to his likely sentence today because life remains within the applicable 360 months to life sentence guideline range. But that is not the proper analysis, as (b)(6) requires a comparison between the sentence received and the "*likely*" sentence today and necessarily implicates both modern charging and sentencing decisions. *See e.g., United States v. Linton*, No. 98-cr-258, D.E. 471 at 4 (D. Md. Sept. 27, 2021) ("As a threshold matter, the government argues that no such disparity is present here because 'murder in aid of racketeering still carries a mandatory life sentence.' This analysis is too blunt. As other courts have found, extraordinary and compelling reasons based on sentence length can exist not only if a defendant would have been sentenced differently if convicted of the same offense, but also if he would have been charged differently under modern standards."); *United States v. Vigneau*, 473 F.Supp.3d 31, 39 (D.R.I. 2020) (finding extraordinary and compelling reasons where defendant was convicted of an offense that "no one has been charged with … in this District in over twenty years."). *See also* discussion and cases cited at D.E. 4335, 18-25.

Other courts have granted reductions under (b)(6) when the original sentence could still technically be imposed under either the guidelines or statute. *See e.g., Spradley,* 2024 WL 1702873

at *9 (in drug conspiracy case in which murder cross-reference was applied, mandatory life sentence reduced under U.S.S.G. 1B1.13(b)(6) where defendant's guideline range would still be life today, but *Booker* rendered guidelines no longer mandatory); *Reedy*, 678 F.Supp.3d 859 (reducing 1,335 year sentence to time served, 22 years, under (b)(6) in child pornography case where the defendant was sentenced before *Booker*); *United States v. Brown*, 715 F.Supp.3d 1034 (S.D. Ohio 2024) (reducing a 119-year sentence for a series of robberies to time served (28 years), even though his six § 924(c) convictions still carried minimum mandatory sentences of at least 44 years).

It is also worth noting that the range of 360 months to life is vast, with a far greater span from low to high end than any other range on the Sentencing Table. As discussed in Mr. Whiting's motion, a life sentence is grossly disparate from anything less than a life sentence. *See also United States v. Allen*, 717 F.Supp.3d 1308 (N.D. Ga. 2024) ("This Court finds that the difference between a life sentence and any sentence less than life is glaringly noticeable" and thus grossly disparate). The wide gulf between 360 months and a life sentence demonstrates not just the import of judicial discretion in post-*Booker* advisory guideline sentencing, but the myriad permutations of reasonable sentences less than life that could be imposed. Moreover, recent trends in this district which attest to both the substantial frequency of downward variances[6] and the rarity of life sentences[7] support the claim that Mr. Whiting's life sentence is grossly disparate to the likely sentence he would receive today.

---

[6] *See e.g.,* U.S. Sent'g Comm'n, "Statistical Information Packet: Fiscal Year 2024, District of Massachusetts," at 12 and 16, noting 58.6 percent of cases in this district involved variant sentences, and of those sentences, 96% received downward variances, and drug trafficking offenses receiving the largest number of variances across all offenses, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2024/ma24.pdf.
[7] *See e.g.,* U.S. Sent'g Comm'n, Interactive Data Analyzer, "Distribution of Sentence Length, Fiscal Year 2024" for the District of Massachusetts, reflecting zero (0) life sentences were imposed and even assuming, for example, the application of career offender and the drug guideline, zero (0) life sentences imposed.

Finally, the government argues that Mr. Whiting's life sentence is not grossly disparate because a likely sentence today would possibly include enhancements not considered by Judge Skinner in 1991. This is unpersuasive. First, it is incredibly difficult, if not impossible, to gauge what Judge Skinner would have done had he received other evidence related to dismissed and/or uncharged offenses proffered by the government, especially where the government fails to proffer more than the specter of such evidence today. Indeed, this Court declined the government's invitation to consider such evidence in 2016 and it should do so again today. That said, Judge Skinner's own comments are particularly instructive here: even in the context of the government's intent to proffer other evidence relative to other enhancements, he explicitly stated that the life sentence he imposed on Mr. Whiting was "extremely severe" and "extremely harsh." D.E. 4335-2. And although the government discounts the extreme disparity between Mr. Whiting's life sentences and the sentences imposed on his co-defendants, it is significant, for example, that Mr. Bartlett's combined sentences – for both the state murder convictions and the federal drug conspiracy – are still substantially less what Mr. Whiting has already served in federal prison.

Life sentence reductions in murders, CCE kingpin, and other drug distribution conspiracy cases support Mr. Whiting's position and are thoroughly discussed in his motion. *See* cases cited at D.E. 4335, 20-26. *See also United States v. Lespier*, No. 3:98-cr-00102-SVN (D. Conn. Jan. 16, 2025) (life sentence reduced to time served, 26 years, in VCAR murder case where defendant who was president of a local chapter of the Latin Kings who ordered and drove co-defendant to kill rival gang member where life sentence was unusually long when compared to all federal sentences and defendant had substantially rehabilitated); *United States v. Kirkland*, No. ELH-94-10, 2024

---

https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed June 5, 2025). NB: To reach this data using the interactive, counsel clicked on "Sentencing Outcomes," then "Sentence Length," and narrowed the results down by geography, primary guideline, and criminal history.

WL 4529303 at *24 (D. Md. Oct. 18, 2024) (reducing life sentence to 40 years for defendant convicted of, *inter alia*, drug distribution and killing in furtherance of a drug conspiracy and who "held a leadership role in a drug trafficking organization, and members of that organization were involved in the murders of two individuals," one of whom was a child caught in the crossfire and the other of whom was a government witness for whom the defendant provided information that "led to her ruthless assassination").

### III.    Mr. Whiting's Fictional Novel Does Not Reflect His State of Mind or Intended Actions Upon Release.

More than a decade ago, Mr. Whiting wrote a "street fiction" novel which mixed certain facts with large swaths of fiction and exemplified tropes common to and consistent with the genre of street literature. *See* D.E. 4335 at 32-36. In its opposition, the government largely reiterates the same arguments it leveraged against Mr. Whiting's sentence reduction in 2016 and now anchors those claims in a YouTube interview Mr. Whiting gave from prison. Quoting a 2013 online review of Mr. Whiting's fictional novel, the government continues to construe his work as "revenge fantasy" and asserts that Mr. Whiting wrote the book to "let everybody know what actually had transpired[.]" D.E. 4348 at 14-15. Not only does this assertion ignore Dr. Gifford's substantive analysis and report, it also misquotes Mr. Whiting and mischaracterizes his intention.[8] A closer examination of Mr. Whiting's comments, his fiction and philosophical writings, and the broader misuse of Black writers' and artists' expressions in the criminal legal field demonstrate that Black street literature is a genre replete with violence and highly prone to fundamental misunderstanding by uninitiated audiences. Mr. Whiting submits that Dr. Gifford's report and opinion correct the

---

[8] Mr. Whiting did discuss his desire to "let everybody know what actually had transpired," but not as to the experiences of his life or the "facts" of the novel. Rather, Mr. Whiting was explaining his desire to correct claims that he cooperated with the government during his prosecution. Such claims are undoubtedly dangerous and concerning for anyone, and are claims that, for Mr. Whiting, are untrue. In short, the events of the novel are clearly fictionalized, and are not things that "actually had transpired." The Court should reject the government's effort to paint things otherwise through an excerpted, mischaracterized quote.

record, so to speak, of his fictional novel, and that his own rehabilitative efforts and other literary

pursuits support a finding that his release would not pose any danger.

At the outset, the government mischaracterizes Mr. Whiting's YouTube interview as a

commitment to the events of his novel as fact or true to his intention. Selectively quoting from the

interview, the government ignores Mr. Whiting's explicit statement that his intention in writing

the novel was to "take a negative ... and transform it into a positive."[9] The novel was planned as

part of a five-book series, Mr. Whiting intended to set the stage in the first book ("*Takin' It To*

*Another Level*") in a world from which his fictional characters eventually break free: specifically,

the street-level drug dealers in the first novel would evolve into characters who do something

greater with their lives – who "help[] to defend their country … from drugs … terrorism, you

know, both home and abroad … So it's a whole, you know, upliftin' process to it."[10] Of course,

Mr. Whiting neither finished nor published sequel novels, and – as outlined below and at pgs. 26-

29 and 39 of his original motion – has instead devoted himself to extensive rehabilitation.[11]

Notably, the portion of the interview addressing Mr. Whiting's fictional novel and his case

are only a small part of a somewhat disjointed but wide-ranging conversation that dealt with his

hopes and policy concerns for a more democratic government, his love for his family, and other

literary and psychological works that have shaped him in recent years. Specifically, in coping with

the anger and "disappointment of not bein' released" in 2016, Mr. Whiting discusses other literary

influences – specifically, "Kings, Warriors, Magicians, and Lovers" by two Jungian psychologists,

which helped him understand and process his emotions and his place in life.[12] This psychological

---

[9] https://www.youtube.com/watch?v=4l_KWU6PG_k.
[10] *Id.*
[11] That the listing for the first novel on Amazon notes a 2020 publication date is inapposite, as Mr. Whiting has been in prison, in continuous custody, since 1991 and has no access to Amazon. In addition, a free copy of the book is available as an exhibit to the government's 2016 opposition filings on PACER.
[12] YouTube link, supra at note 9.

study has been heralded as "a must read for men searching for secure attachments in relationships, healthy emotional regulation, a deep sense of purpose, and the strength it takes to be selfless," whose premise is that "mature masculinity is not abusive or domineering, but generative, creative, and empowering of the self and others."[13] The shifting of Mr. Whiting's interests – and his study and embrace of different genres of literature – is further evidenced by his more recent writings, with which the government does not engage. *See e.g.,* discussion regarding his second book, *The Kybalion Reconciled*, at D.E. 4335 at 36.

Focusing exclusively on Mr. Whiting's comments about his book, the government fails to acknowledge his stated commitment to his own "growth and development":

> Some people do the time; some people let the time do them, you know what I'm sayin'? And I'm not one that tho – let the time do me; I'ma do the time. So you know, I disciplined myself with my time … I educated myself with my time … And I trained myself with – you know, my time, just for the things that I wanted to do, constructive, to donate, contribute to society for when I get back out there[.]"[14]

*Id.* This kind of introspection is not new to Mr. Whiting, as it was significantly influenced by the Court's denial of his 18 U.S.C. § 3582(c)(2) motion in 2016. As he shared with Ms. Cohen: he is grateful "for the time he's had since his Reduction in Sentence was denied in 2016. He believes the time was necessary for him to complete what he calls his 'conversion,' which has in turn allowed him to fully realize his remorse and rehabilitation." D.E. 4335-6 at 20.

Most striking, the government's opposition completely fails to engage with Dr. Gifford's careful and comprehensive analysis of Mr. Whiting's novel, and his expert opinion that the novel is "definitely a work of fiction," "not some unmediated reflection of his autobiography and mindset." D.E. 4335-7 at 1-2, 14. Indeed, the very things the government characterizes as evidence

---

[13] Amazon listing for "King Warrior, Magician, Lover: Rediscovering Masculinity Through the Lens of Archetypal Psychology," published August 16, 1991 (accessed June 3, 2025), https://www.amazon.com/King-Warrior-Magician-Lover-Rediscovering/dp/0062506064.

[14] YouTube link, supra at note 9.

of Mr. Whiting's state of mind – the use of some true facts and some real names, and the extreme and graphic violence and gore – are common and ubiquitous tropes and qualities of the street literature genre itself. *Id.* In Dr. Gifford's expert opinion, Mr. Whiting's fictional novel is an unmistakable part of the street literature tradition and – both in structure and substance – was influenced by and modeled after the forebears of Black urban storytelling like Iceberg Slim and Donald Goines. Put simply: Mr. Whiting wrote both the characters and their conduct in the novel with specific genre expectations in mind that would be recognizable to anyone even remotely familiar with street literature, or even hip hop.

The conflating of an artist's "persona" with their true identity and thoughts, however, is not new, nor is it unique to Mr. Whiting. As discussed in his original motion and in Dr. Gifford's report, Black authors – from the time of slavery – have been assumed to be writing from an autobiographical perspective rather than a specific artistic register, especially in the field of "crime" or noir fiction. This may explain the tendency to believe that Black street literature, like Mr. Whiting's *Takin' It To Another Level*, that contains references to real events and names is *true* and thus reflects the author's state of mind. *See* D.E. 4335 at 33-35; 4335-7 at 5-7. The sociological "fact" of urban crime is at the core of the art form, but the view of Black street literature as simply autobiography fails to acknowledge and appreciate the unique cultural and commercial pressures on Black artists to exaggerate their public image as a "gangster" in order to be more commercially viable and palatable to their audiences.[15]

---

[15] "An avowed tenet of rap artists is that the artist and product should "Keep It Real." … [This] may mean the rejection of sanitized Hollywood depictions of life and of conscious efforts to cross over and become accepted by white audiences … [or] it may be understood as an effort to reveal the complexities and depth of life in the inner city [or] the glorification of crime and the ills of urban poverty […] artists must also deny that their images are manufactured in order to rebut charges of fake gangsterism and help their buying audiences sustain their beliefs." Andrea L. Dennis, "Poetic (In)Justice? Rap Music Lyrics as Art, Life and Criminal Evidence," 31 COLUM. J.L. & ARTS 1 (2007) at 19-20 (internal quotations and footnotes omitted).

Although the exaggerated and gratuitous violence may be disturbing to the uninitiated street lit reader, it is a common and commercially successful trope that is prevalent in other quintessential Black art forms as well. Hip hop artists and rappers famously rely on exaggeration and hyperbole to craft their larger-than-life characters, drawing from the same tropes and depicting the same kind of graphic violence as street lit authors like Mr. Whiting. And rappers, like street lit authors, often have their lyrics questioned, misinterpreted, and mistaken (sometimes willfully) for literal "truth" even when they are figures of imagination:

> As artists, rap music lyricists are similar to fiction writers. Rap music lyrics consist of constructed images, metaphor, braggadocio, or exaggerated storylines. At times, a defendant-lyricist may incorporate the experiences of another – either in whole or in part – into his lyrics. On top of this, the artist's effort to maintain authenticity – to "keep it real" – creates confusion regarding what is or is not the truth about a defendant artist and his life. Is he creating fictional accounts of his life? Is he merely creating a character or are the lyrics his true alter ego? Where does art end and reality begin? What or who is literal and what or who is figurative? Thus, lyrics may not constitute a confession to an actual crime, much less the crime charged. They may instead be abstract representations of events or ubiquitous storylines frequently employed in rap music.[16]

There is, however, a fundamental difference between rap and street lit that relates directly to rap's ubiquity and the public's willingness to disengage that violent art from the artist. For example, famous rappers like Ice Cube and Ice T[17] were publicly excoriated by mainstream white media and politicians for releasing music that featured significant and explicit themes of anti-police violence.[18] In the years since, however, both rappers have moved beyond their "gangster

---

[16] *Id.*, at 25-26.

[17] Both Ice Cube and Ice T named their public personas after Iceberg Slim, the so-called father of Black street literature.

[18] The element of race – both the fact that Mr. Whiting is Black and many hip hop artists and rappers are Black – cannot be ignored. Contrast, for example, the white rapper, Eminem, whose notorious hit "'97 Bonnie & Clyde" involved lyrics of him killing his wife in graphic detail, and dumping her body with his daughter in tow, garnered much less controversy than Black artists who wrote comparably violent lyrics. Eminem's popularity and reputation nonetheless remains intact, despite years later claiming: "None of it was to be taken literally … Although at the time, I wanted to f---ing do it. My thoughts are so f---ing evil when I'm writing s—t." Anthony Bozza, "Eminem Blows Up," ROLLING STONE, Apr. 29, 1999, https://www.rollingstone.com/music/music-news/eminem-blows-up-91979/ (last accessed June 3, 2025).

rap" days and portrayed police officers in different popular acting roles, most famously with Ice T – the rapper who was made famous by his song "Cop Killer" – portraying Detective Tutuola on *Law & Order* for nearly three decades.[19] The willingness to separate their artistic persona (cop-hating gangsters) from other roles they play (police officers) perhaps speaks to the palatability of the latter for mainstream audiences, the opportunities these artists had to reframe their public images, and the increasing public acceptance and embrace of hip hop in mainstream music.[20]

Darryl Whiting has written a fictional novel wholly within the genre expectations and canon of street literature, but the government urges this Court to conflate his true intentions with the words on the page and to view the art as indistinct from the artist. In so doing, the government ignores the history and tradition of street literature and the lessons we have learned from conflating the art with the artist in rap and hip hop. It also ignores other substantive evidence of Mr. Whiting's state of mind: his other philosophical and mystical writings, his tremendous efforts towards rehabilitation which include a "minimum" recidivism score and a move to lower security, his devotion to his last living family, and his continued expressions of remorse.

Respectfully submitted,
DARRYL WHITING
By His Attorneys,

Dated: 6/6/25

*/s/ Sandra Gant*
Sandra Gant, BBO # 680122
Oscar Cruz, BBO # 630813
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
Tel: 617-223-8061

---

[19] *See e.g.,* Jeremy Dick, "Ice-T Reflects on Playing a Cop After 'Cop Killer' Controversy," Movieweb, Feb. 18, 2023, https://movieweb.com/ice-t-cop-killer-playing-a-cop/.

[20] Another prominent example: the famous gangster rapper Snoop Dogg – who, in the early 90s, was prosecuted and acquitted for murder in a case which prosecutors sought to use his song "Murder Was the Case" as evidence of his guilt – has since gone on to achieve mainstream contracts with Martha Stewart, appeared as a torchbearer at the 2024 Paris Olympics, and most recently performed at a pre-inaugural ball for President Trump.

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 6, 2025.

*/s/ Sandra Gant*
Sandra Gant